case number 2140 30 Johnson versus Davis County. Thank you, Your Honor. I may please the court. This is Daniel Buzinski. I'm representing the appellants in the state of Mr Hayes, Mr and Mrs Johnson. Uh, I would like to reserve three minutes for my rebuttal. Um, we'll see how that goes. Um, so the Johnson party's originally sued Davis County and Sheriff Richardson for their role in implementing a screening and admission process at the jail that my clients allege are deficient. Um, in particular, they do the sheriff, uh, personally or only as a official of Davis County. They sued him in his individual and official capacity. But the Davis County Jail for its deficient admission admission practices. Specifically, um, Davis County allows on trade intake staff to make medical decisions and give some discretion on how to handle health issues. Um, just to quickly summarize the facts, Mr Hayes presented at the jail after admitting to having abuses, prescription medications that violated his parole. And so he was taken to Davis County Jail, put on a 72 hour hold so that he could clean up. Uh, at the Davis County Jail, he presented with two empty bottles of prescription medications. Uh, one his anxiety medication, clonazepam and the other Tylenol PM. And he also disclosed taking two anxiety medications, the clonazepam and I believe it's the of clonazepam, which on its own is a potentially fatal dose. And when you mix it in with other medications, it only becomes more dangerous. Now, the issue was, um, the deputy that was doing his intake had no training and so no training in intake or in, um, in medical. So had no, can I get you to back up? I want to, I want to clarify because that, that business about the 16 milligrams makes me reminds me that there's just kind of a, a real uncertainty in the record when he said he was, he, he told the screening officer that he was, he took 16 milligrams. He was talking about the clonazepam, correct? Yes. But it seems that he was more likely talking about his other, one of his other prescriptions, which, because he said he took the daily tech, he's prescribed two a day and he took two or three, I think. So it seems that maybe he was not really talking about, um, he might had his two prescriptions mixed up is what it sounded like, right? Yes. It's possible that what he disclosed to the jail officials was not exactly what he took. Right. You're suggesting he was saying that he took 16 because those were one milligram, I think. Yes. The clonazepam. And you're saying that he, he told them he took 16. But in fact, what he was telling them that was that his prescribed dosage. So he's, he was either mixed up or we can't really read that to think that the screener should have known first of all, what the correct dosage was and, and think that he had taken a pretty good overdose of it. What the screener testified to is she understood that he had taken 16 milligrams of clonazepam and wrote on the intake form that he took 16 milligrams of his prescription medication. Now, whether the intake officer could have or should have understood is really irrelevant because the question is whether it put the screening officers on notice that there was a potential serious issue here. So what ended up happening is she didn't recognize obviously that 16 milligrams was a fatal dose or potentially fatal dose did not even really understand clonazepam because she couldn't put it down on the form and didn't order a medical screening by a nurse or any medical staff didn't order medical observation and simply admitted him into the jail. I'm having, I'm having trouble though. A disconnect here. Uh, the, the clinician, the people on the staff that in the, in the department that did the admitting, they're not sued. Right. So we're only, it's only Davis County and the sheriff that are sued for a policy that is deliberately indifferent. So the question isn't really whether in this particular case, uh, somebody screwed up and they should have clarified the drug dosages or shouldn't have, and therefore liable for negligence or not, or, or even deliberate indifference. The, the question is only whether the policy reflects that the office is deliberately indifferent to people that come in with a drug problem. Isn't that, isn't that the question? Yes, your honor. I would clarify that these facts are not relevant because again, not to any individual's liability. Um, as to specifically what happened that day, because again, nobody is has to be an underlying constitutional violation. And so it gives the context for what happened here, which is inmate presents intoxicated. Um, and not just with your basic intoxicated symptoms, but there's some indication that it's more serious. And because of the policy that Davis County had instituted doesn't receive a medical screening, doesn't receive a periodic observation by trained staff. Well, just for clarity, let's say that I had a, I was the sheriff's office and I had a policy that there's an important question that has to be decided on intake. You have to determine whether the person is, uh, I don't know, uh, has peanut allergies. Uh, and so you've got to check out allergies and then an intake person comes in and doesn't check and gives these guy peanuts and he dies. Uh, that's not going to make the, the office liable because they weren't deliberately indifferent in their policy. It might make a sheriff on that. I mean, a deputy on this spot liable, but that's not being alleged here because they're not even defendants. Is, is that correct? Am I looking at this correctly? I'm looking at the policy and deciding whether the to prevent a finding that they were deliberately indifferent. Is that an articulation of the issue before the court? That is correct. So, so, and to kind of distinguish the hypothetical from the present facts, if Davis County had instituted the policy that they had written down, which is each individual that presents as intoxicated, get screened by a nurse. And it just so happened that on this one off, it didn't, that would not be a policy violation. The issue here is that they had written a policy that says that that's supposed to happen, but in practice it rarely happened. I believe the testimony from the nurse was that maybe one or one in 100 or one or 200 individuals that presented as intoxicated actually was seen by a nurse at the time. So, so the policy or custom that you're challenging here is that the, that they, that the, they didn't comply with their own written policies in practice. That's part of it. Your honor, obviously written policies don't establish constitutional rights, but the violation of their own policy is evidence of subjective deliberate indifference. Now the constitutional violation is not enough, but not enough for, for subjective deliberate indifference either. Yes, it's, it serves as circumstantial evidence of, of subjective deliberate indifference, but the underlying constitutional violation was actually addressed by this court in Olson versus Layton Hills, which has like eerie similarities to the present case. So that case involved Davis County again, and their intake policies there. Uh, Davis County was, did not have policies in place to address OCD, um, did not train its staff on OCD and instead gave them discretion on how to handle it. And they used ineffective factors like are they exhibiting psychotic symptoms? Uh, the 10th circuit in that case overruled the district court's finding of deliberate difference and said, there are questions of fact here as to whether a practice that allows untrained staff discretion on how to handle OCD is deliberately indifferent and cause the underlying harm. Isn't it distinct? First of all, I guess, because of that, because it was a, at least in part of failure to train case. And I think they found that my understanding of it is that there was this underlying, uh, collective constitutional violation for individual, there must, I'm not remembering now, was there an individual or collective violation in that case? So there, that was not addressed. Yeah. I don't think it was even addressed. Right. Yeah. There was an individual that they addressed in that case, but that had, I believe that was in relation to bringing them over to the hospital. Had to do with the arrest. Didn't have to do with the way OCD was treated at the jail. Um, and as for the failure to train that's shared. So there's a failure to train claim in ours. And I would say that the present case is actually more And the court said, look, OCD is sufficiently prevalent and presents sufficiently harmful symptoms of mismanage that it's a question for the jury as to whether this is deliberate indifference here. I'm a little confused about what you're saying. If it's a training case, if it's a training case, you don't have to have a collective constitutional violation, right? You just have to have, I mean, you, you have to have an individual violation. This court. So, so this court in, I believe it's crossing or it might've been right. Yeah. It found that there doesn't have to be an individual liable. Sometimes there are cases where if it's not a training case in a training case, we said there has to be an individual liable. I don't read it that way, but you know, I, I won't argue about that. Um, yeah, there is, there is parts of it that is training and parts of it that's policy because the actual practice on the ground violated the written policy and the written policy serves as knowledge or at least circumstantial evidence that Davis County knew that intoxicate individuals required some sort of care. And the fact that they ultimately ended up providing no, um, no screening by trained individuals, no medical review by nurses, no, um, observation by trained could, could be considered or at least needs to be presented to a jury in terms of determining those factors. Um, as to an individual being liable, your honor, we point to deputy bear as probably the principal figure. There is no requirement that we actually bring a claim against her, establish her liability. There has to be an underlying constitutional violation. Right. But, but deputy bear is the individual that we laid, I guess the most blame on. And are you suggesting that there was a collective violation? The way I would put it, your honor is that I guess it depends on what are you basing that on? It's either that deputy bear of recognize the symptoms of intoxication and failed to satisfy your gatekeeping duty and bringing in a nurse. Or if you're doing it more collective and you're saying, well, I'm asking you not, I'm not saying it's not up to me. You're the one that has to prove the constitutional violation. Yes. The alternative or individual, the alternative, your honor. And if it hinges on while she was trained to do it otherwise, then it's collective because she was, there was lack of training as to how she should do it. And based off of how everybody else was doing it, she decided to base it off of factors like, can they walk, can they talk, which do not elucidate the risks of withdrawal or overdose. Counsel, can I jump in here? I know your time is short, but um, could you directly address the district court's opinion in the case? Uh, the district court seemed to be, uh, thinking that there was lack of causation, uh, or there could no matter if there had been medical training, there was no demonstration that that would have made a difference here. Could you address that? Yes. So as to the causation issue first, the court finds that, well, perhaps there was evidence of a clonazepam overdose, but there wasn't evidence of multiple drug use. So first off, there's, that's factually incorrect. The record establishes one that the, uh, that mr Hayes disclosed two medications to anxiety medications and also came in with two prescription bottles that are empty. Now, one of them has shared the clonazepam, but there's at least evidence that perhaps three medications were taken, which in fact were taken. Um, can I ask you, though, uh, the district court says bases this on statements that he made. Apparently, are you suggesting there were statements made or I don't know, inferences could be drawn. I mean, could you clarify that? Yes. So first there were statements made in one of two anxiety medications. So this isn't just a case about Mr Hayes presenting with or just telling them that he took one medication. The other issue is that it doesn't matter. The issue, the underlying constitutional violation is whether he presented with sufficient risk to warrant, um, to warrant medical attention of some sort of medical intervention. What happened afterwards is irrelevant to whether that constitutional violation existed. And then the other thing I would point out your honor. Why is it irrelevant? He had twice a visit by a nurse, a medical person before he died. So if he had an old overdose problem, he did get looked at medically twice before he died. Why doesn't that negate any deficient assignment in the first place? Because it would have been cured by the very remedy that is being sought here that said was deficient. So first, your honor, the nurse testified that he was provide no information about intoxication, that if he had been provided information about the intoxication, even evidence that he had come in with two empty prescription bottles, the nurse would have sent him off to the hospital. And then the second problem of the nurse, wasn't that just negligent nursing? I mean, shouldn't he? The nurse have then gone to the intake person and said, well, how much drugs did he take? I mean, it seems to me that this devolves into more of a negligence case than anything else. I to address that first point, your honor, the nurse was no longer the intake officer was no longer there. And the information she put on the intake sheet was simply that he took 16 mg of his anxiety medication. But then that goes on. If the intake sheet was inadequate, that is a as conducted problem should have sued the intake person rather than a deliberate policy mistake, it seems to me. But the not to get argumentative, the policy issue is that she did not write down the information correctly because she was not trained. She couldn't even she didn't know what clonazepam was. She couldn't write down clonazepam. And then the other issue, your honor, is even if there was subsequent follow up care in motto versus says the sport found that the delay in care and can create a harm. So that case, a nurse or individual was presented with a symptoms of chest pain, uh, didn't send the individual for medical intervention was seen later that morning. And she tried to argue that was a defense in the courts. That's not a defense that might limit the damages. But that's still a constitutional violation because there was a delay of care. Thank you. Thank you. I'm sorry. Your time is up. Yes. May please record. Can you hear me, ma'am? Yes, I can hear you. Can the others? Yes. I would like to start. Uh, it's been this case has been a moving target. This argument has illustrated that, uh, the official capacity suit against the sheriff was dismissal. There is no defendant in the first cause of action for failure to provide medical care. Um, just where is she asked about the medications? He came in what with two prescription bottles. He came in with clonazepam bottle and Tylenol. It's interesting. It's important. The class pan bottle and prescription was 30 tablets. It had been filled in October, and this is the middle lot of December when he comes into the booking area. So there's nothing to indicate that he had taken all 30 tablets or even a substantial amount of tablets, except that he'd gone home with it earlier that day. It had 23 tablets. Booking people don't know that it's a different shift, and he's coming in. Uh, they said no training. They're training on. He talks about screening him for drug and alcohol abuse. They're trained to do that. They're very good at that. There's been no history of any death or serious injury due to overdoses because of this training at that facility. Not, uh, he did not take 16 milligrams. I mean, he did not take 16 of his clonazepam tablets. He told that's on the videotape. He told, uh, both probation officer Herman and the intake officer Bauer that his tablets were eight millimeters, and he takes two a day as needed, and he usually takes one whole tablet and one and half of another during the day. So with this based on your argument about no prior evidence of deaths, would this case have been different if there had been a prior case of death of drug overdose and inadequate intake? Uh, yes, sir. I'll be honest and candid about that. If, in fact, uh, the sheriff puts in the policy to season be working, there's nothing indicated to him or the county. It's not working. If suddenly this discretionary judgment call, uh, isn't working and someone dies and he's gonna revisit it, take care of taking it. You are suggesting here that the next time this happens, the county will be liable if they don't correct their approach. Now, is that what I would say? I'm not gonna confess against my client, sir, but I would think that the plaintiff's counsel will be all over that in the future. That would go. You're saying that would go to deliberate indifference, right? Yes, ma'am. Right. You're saying there was this would be a case where there isn't a single instance or they didn't have any notice of any problems with their policy or their custom, at least in this case or their training or their training. Yes, ma'am. These were experienced officers. The next point is what about the Olson case, sir? Could you address that Olson versus Lake Hills? That does cause me some concern. I did. It did seem that they were talking about, you know, they were talking about deliberate indifference in that case, too. And they were talking about municipal liability here. But I think the difference is is a huge difference. Also, there was no policy dealing with oppulsive, uh, obsessive compulsive disorders. We have a policy dealing with admission of inmates here under the influence of drugs or alcohol. There was no training in Olson dealing with people with being admitted with obsessive compulsive disorder. The officers are trained here. And most importantly, in Olson, plaintiffs told him he suffered from the disease and needed his medications, and they refused it to him. That's different. I know, but in terms of there certainly wasn't anything in that case, though, any prior instance or anything like that, right? Well, that's well, that's a case I saw figured on the fact that it was a policy. They didn't have a policy. They knew that this was an issue out there in society, and they didn't have a policy to address it at all. The Davis County Jail had a policy addressing, uh, drug and alcohol admissions. But the allegation is that we Davis County essentially ignores the their custom is to not follow their policy. No, ma'am. The policy is when when it's an officer's judgment that it's needed, they bring in a medical staff to look at the individual. And that brings me into the point. I think this case affords the court and with all due respect, the opportunity to address three my mind three issues probably need some judicial gloss. First is personal responsibility. Mr Hayes had three opportunities to tell officers the truth about the drugs he had taken. He doesn't, but he's consistent. What he says. He says, I took two of my anxiety pills and some time all over the counter sleeping medication. I'm confused. Where does personal responsibility fall into our analysis? It you know, normally you would think it would deal with a situation where uh, it's the state of mind. It's the subjective state of mind for the officer. But this goes more than that. He's the son of instance where he didn't tell. He didn't tell the truth. And that's an application issue involving the parties and how they dealt with this case. I don't see how that goes to a question of whether the county in the jail had a proper policy or were deliberately indifferent to the problem. But it goes to yesterday, but it goes to causation. And we had in the record is the declaration of our expert Dr Tubbs on page 2 74 of the appendix and tell us makes these points. He said, had Hayes told the truth, we have a different outcome. He says it's some paragraphs 23 and 27. I think he also says even if you've taken Hayes in hospital and he had presented the way he did it to jail, walked in, talked, answered questions and said, I'm taking two of my anxiety tablets. They would have released him back to the jail. They wouldn't have hospitalized him. And that's what we're dealing with here. Is this he missed? It's the misleading aspect of it. And that that brings up the second issue. I think that I would think needs some some point of clarification. And players councils talked about it. Just a great question about talking about the closing case. I believe you need the cases support me. I think that this you need an underlying via constitutional right for any claim under 1983. Uh, they don't have it here because a court said I've considered the actions of the staff individually and collectively, and I do not find there's evidence of support delivered indifference. And that's what he addressed the first cause of action. He applied the gross. He didn't say I need one person. He said, I'm looking everything. It's not there. Uh, the third point, and I think this one to me is the most troubling players council that says policies can't give rise to a constitutional violation. Yet that's exactly what they're arguing here. This is not a medical malpractice case. This is not a negligence case. To the extent Mr Hayes had a constitutional right. That right has to be found in the Constitution, not the jails policies. And I think the Supreme Court made that clear in the Davis case. And the reason for that, I think it's very simple. If you if you make constitutional rights based on jail policy, then your rights would vary from jail to jail. There would be no blanket recognition of the right. If I was incarcerated in the Davis County jail, my rights under policies might be different on the city. So we need uniformity, and that's uniformity in the federal law and the Constitution. The other thing you don't want to do is if you say, well, we'll determine violations based upon your policies, you're going to discourage jails from enacting far reaching and expansive policies to protect inmates. Why would I enact a policy if I would be judged by it? And this will be a violation when I can do nothing. And as long as my officers are not deliberately different, I'm okay. You're actually shouldering them with more of a burden if they reach out and try to be more protective, more assertive. Now, what's the purpose of a policy in the Civil Rights Act? I think it can be evidence of subjective intent on any inmate who presents with chest pains should be presumed to have a heart condition and taken to the emergency. And I present with chest pains, the officer doesn't take me to the emergency. He obviously knew based on that policy that I did potentially face a serious risk, a substantial risk of serious harm. That's the use of the policy. In this case, to have every inmate admitted in jail screamed, let's just say intoxicated, or it says every inmate should be medically screamed. That's the Constitution that required that. And even their own expert, Mr. Green, said that's the best correctional practices, but it's not required. It's not a constitutional mandate. And in this case, as Justice Eagle said, noted, he was seen by Nurse Layton. The question is, counsel quoted the testimony from Nurse Layton. It's not quite accurate. It was, if you had known he'd taken 16 of his clonazepam tablets in this hypothetical hypothetical, would you have admitted? Well, no. But the point is, he didn't present as having taken 16. There's no evidence that he did. In fact, the autopsy report says even 20 milligrams is not lethal. The autopsy report said that all the medication he had on board was within therapeutic limits. And the key to his death is in the report of our expert, Dr. Hanson, of toxicology. Hanson says, you know, these drugs would not have killed him standing alone. The cause of death was due, in his mind, to two additional factors. The Tylenol PM he took, which depresses the central nervous system so you can sleep. And what he described is, I think, what most of us think of as REM sleep. It occurs about 5 in the morning when your body goes to a natural, sedative, sedating condition. And he said he mixed all that together, and it was a tipping point. That he went over the edge because it just, it reduced his central nervous system to the point where you couldn't breathe anymore. But they had watched him 32 times over the course of that eight hours. You know, admittedly, they didn't go in all the time. Plaintiffs before the district court argued that they should go in every 15 minutes and wake him up. If we'd done that, we'd get a civil rights case, say we're depriving him of sleep. But they did go in and monitor him. They did watch him through the rhythms. They didn't ignore this man. And I know support has some questions. If I could just take a moment with my notes. That may be, I think that's all the points I would make. This is just to emphasize one last time. Their expert, Dr. Starr, says, well, if he'd been taken to the emergency room, this would have been different. Well, there's no policy requiring him to be taken to the emergency room. Dr. Starr also said that he'd taken 23 of his Clonazepam tablets, and that's not true. The autopsy reports show he hadn't taken that level. He'd taken basically within his normal therapeutic limits. And that would have been two pills a day, one to two pills a day. The same for his other medications. That's right. I have nothing more to say unless you have questions. Well, are you saying that the autopsy report confirmed only a minimal dosage of that Clonazepam? Yes, sir. I think that was in the district court's opinion and Dr. Tubbs' opinion and the medical examiner's report, too. These were within therapeutic levels, but it was the mixture, Dr. Hansen says, and he picked those three. And it's interesting that the medical examiner never did a tox screen for Tylenol PM. I think his opinion may have been better. He said mixed drug toxicity, which I think is true. But he was missing one of the key drugs, and that would have been Tylenol PM. At five in the morning, Ward, his central nervous system, to the point where he ceased breathing. Thank you. And the last point, too, is this is not a case that he said, she said, because we have him on video walking into that intake center, telling Bauer he'd taken two of his anxiety pills, telling him what the doses are, 16 milligrams twice a day. Sometimes he only takes 16 in the morning and eight later. And this is important. And I, they do a search, and this is on tape, to take his shoes off. He doesn't sit down to take his shoes off. He's standing, bends over, pulls up his leg, takes off one shoe, shows it to the officer, bends over, puts it back on, bends over, lifts his leg, takes off the other shoe, puts it back on. And while the plaintiffs may say he was heavily sedated, heavily intoxicated, the videotape shows the officer. This is a man, yes, he's loaded. There's no doubt about that. But he's mugging to the officer's point of kisses, joking with him. Nothing would put him on notice of this man being dead eight hours later. Could be dead eight hours later from something they've missed. Thank you. Thank you, counsel. I think we're, we didn't have anybody left yet. So thank you, counsel. We appreciate your arguments. The case will be submitted and counsel excused. Thank you. Thank you.